[Nos. 81332-9; 81427-9.   En Banc.]
Argued June 26, 2008.     Decided November 20, 2008.

RESIDENTS OPPOSED TO KITTITAS TURBINES ET AL., *Petitioners*, v.
THE STATE ENERGY FACILITY SITE EVALUATION COUNCIL ET AL.,
*Respondents*.

KITTITAS COUNTY, *Petitioner*, v. CHRISTINE O. GREGOIRE, *as
Governor*, ET AL., *Respondents*.

276

278

*James C. Carmody* (of *Velikanje Halverson, PC*), and *Jeffrey D. Slothower* (of *Lathrop, Winbauer, Harrel, Slothower & Denison, LLP*), for petitioners Residents Opposed to Kittitas Turbines and F. Steven Lathrop.

*Gregory L. Zempel, Prosecuting Attorney*, and *Neil A. Caulkins, Deputy*, for petitioner Kittitas County.

*Robert M. McKenna, Attorney General, William B. Collins, Deputy Solicitor General,* and *Kyle J. Crews, Assistant*; *Darrel L. Peeples*; *Frederick D. Gentry* (of *Bean Gentry Wheeler & Peternell*); *Timothy L. McMahan* and *Erin L. Anderson* (of *Stoel Rives, LLP*); *Narda D. Pierce* (of *Benedict Garratt Pond & Pierce, PLLC*); and *Susan E. Drummond* (of *Foster Pepper, LLC*), for respondents.

*Susan Ackerman, Kristopher I. Tefft,* and *Christian M. McCabe* on behalf of Association of Washington Business and Northwest & Intermountain Power Producers Coalition, amici curiae.

*Sara Patton* on behalf of NW Energy Coalition, amicus curiae.

¶1 OWENS, J. —

## NATURE OF THE CASE

¶2 This case involves the State's authority to permit the construction and operation of wind turbines for energy production in the state without authorization from the county in which the turbines will be placed. Specifically, we consider both jurisdictional and substantive challenges arising from the governor's authority to site an energy facility that exclusively uses wind power under the energy facilities site locations act (EFSLA), chapter 80.50 RCW.

¶3 Initially, we must determine whether this court has jurisdiction to review a petition certified from superior court. Under EFSLA, a party may file a petition in Thurston County Superior Court for review of the governor's decision to approve an energy facility site. Upon receiving

the petition, but before taking its own review, that court will certify the petition to this court if it determines that the petition meets certain criteria. The main question regarding jurisdiction is whether this procedure violates article IV of our state constitution by vesting direct review in this court without requiring initial review by the superior court.

¶4 We hold that the certification procedure under EFSLA confers appellate jurisdiction on this court and therefore does not violate the constitution. We accept review of the certified petitions from the superior court.

¶5 Having determined that this court has jurisdiction, we must address the various substantive challenges to EFSLA raised by Residents Opposed to Kittitas Turbines (ROKT), Kittitas County (County), and F. Steven Lathrop (collectively Petitioners). Petitioners argue that EFSLA does not authorize the governor to preempt county land use laws when siting a facility that exclusively uses wind power. Petitioners further argue that the State abused its authority in deciding whether to preempt county land use laws, that it violated the appearance of fairness doctrine, and that it failed to adequately consider an environmental impact statement. In addition, Petitioners urge this court to remand the case to the superior court for further fact finding on alleged procedural irregularities in the State's siting process. We reject all of Petitioners' claims and hold that the governor properly exercised her authority under EFSLA to approve the site certification for the wind energy project in this case.

## FACTS

I. *Statutory Procedures*

¶6 EFSLA governs the location, construction, and operation conditions of energy facilities in Washington. It creates a process for determining energy facility locations in the state. An application to construct an energy facility requires site certification, a binding agreement between the applicant and the State that conditions approval of an

energy facility location on the applicant's assured compliance with certain regulations related to the construction and operation of the facility. RCW 80.50.020(5). Site certification authorizes the applicant to construct and operate an energy facility in lieu of any other permit or document required by any other agency or subdivision. RCW 80.50.120(2), (3).

¶7 The legislature created the Energy Facility Site Evaluation Council (EFSEC) to administer the site certification process. RCW 80.50.030. EFSEC is a multiagency body comprised of representatives from various state agencies. RCW 80.50.030(3). A county in which an application has proposed an energy facility site also shall appoint a representative to EFSEC for consideration of that application. RCW 80.50.030(4). EFSEC receives and processes applications for site certification pursuant to its own adopted guidelines. RCW 80.50.040(2), (5), .071.

¶8 EFSLA expressly preempts energy facility certification decisions by other governmental entities. RCW 80.50-.110(2). However, EFSEC must first hold a public hearing to determine whether a site certification application is consistent with the county land use plans and zoning laws. RCW 80.50.090(2). Furthermore, EFSEC must include conditions in a site certification to protect the interests of the local government or community affected by the proposed facility. RCW 80.50.100(1).

¶9 At the time it processed the application in this case, EFSEC had promulgated regulations governing how it would implement its preemption authority over local jurisdictions. Under these regulations, if EFSEC determined that an energy facility site was not consistent with local land use or zoning laws, then the applicant had to make all reasonable efforts to resolve noncompliance with the local jurisdiction. Former WAC 463-28-030(1) (2004), *repealed by* Wash. St. Reg. 07-21-035 (Nov. 9, 2007). EFSEC would stay its own proceedings during the period that the applicant sought compliance with the local jurisdiction. Former WAC 463-28-030(2). The applicant could request preemption by

EFSEC after attempting to resolve noncompliance issues with the local jurisdiction. Former WAC 463-28-040 (1978), *repealed by* Wash. St. Reg. 07-21-035 (Nov. 9, 2007).

¶10 After processing an application, EFSEC must prepare a report for the governor recommending the disposition of the application within one year of receiving it. RCW 80.50.100(1). If EFSEC recommends that the governor approve the application, then it will provide a draft certification agreement to the governor. *Id.* The governor must either determine whether to approve or reject the draft certification or direct EFSEC to reconsider certain aspects of the draft certification. RCW 80.50.100(2)(a)-(c). If the governor directs reconsideration, EFSEC will revise the draft certification and resubmit the application to the governor. RCW 80.50.100(2)(c). The governor then must approve or reject the application. *Id.*

¶11 A party may file a petition for review of the governor's final decision in Thurston County Superior Court. RCW 80.50.140(1). That court will certify the petition to this court if it determines that the administrative record is complete and review can be made on the record, that the petition involves fundamental and urgent public interests, and that review by this court would likely be sought regardless of the decision in superior court. RCW 80.50.140(1)(a)-(d).

II. *History of the Kittitas Valley Wind Power Project Application*

¶12 In January 2003, Horizon Wind Energy, LLC,[1] through its subsidiary Sagebrush Power Partners, LLC, filed an application with EFSEC for site certification of the Kittitas Valley Wind Power Project (KVWPP or Project). The original Project proposed the construction of up to 121 wind turbine generators located along Highway 97, roughly halfway between Cle Elum and Ellensburg in Kittitas

---

[1] Horizon originally filed its application under its former name, Zilkha Renewable Energy, LLC, but changed to Horizon after being acquired by Goldman Sachs.

County. Horizon allegedly chose this site because of the reliable wind resource and its proximity to several electrical transmission lines to which the turbines could connect.

¶13 The KVWPP consists of several turbine "strings" running along ridge tops over private and state owned land. Administrative Record (AR) at 52, 322 (map). Horizon obtained wind option agreements with all private landowners on whose property it would install turbines. It also negotiated a lease with the Department of Natural Resources (DNR) for use of state lands that consist of approximately one-fourth of the project site.

¶14 The Kittitas Board of County Commissioners (BOCC) appointed a representative to EFSEC for consideration of the Project. *See* RCW 80.50.030(4). The County also moved to intervene as an interested party in the adjudicative proceedings. EFSEC granted intervention status to the County; the Department of Community, Trade and Economic Development (CTED); ROKT; county resident Lathrop; and other parties before it held an adjudicative proceeding regarding the KVWPP application.

¶15 Lathrop filed a motion to disqualify DNR and CTED from participating as members of EFSEC based on the apparent interest that each department had in the KVWPP. Specifically, Lathrop alleged that CTED had conflicting interests in seeking party intervention to support the KVWPP application while holding a seat as a member of EFSEC. The County joined in Lathrop's motion to disqualify DNR from participating because DNR "owned" some of the project lands. AR at 2438, 2389 (acknowledging lease between DNR and Horizon). The representative of each department denied the motion to disqualify their respective departments from EFSEC. *See* RCW 34.05.425(3); AR at 2518-19 (Lathrop's petition for review of EFSEC order denying motion to disqualify).

¶16 EFSEC held a hearing in May 2003, at which the parties agreed that Horizon's application was not consistent with the Kittitas County Code (KCC). The County had recently enacted a Wind Farm Resource Overlay Zone

ordinance to require county approval of any "wind farm" location through a permitting process. AR at 461-62 (citing ch. 17.61A KCC). The ordinance did not zone for wind farms but instead required applicants to apply for both a site-specific rezone as well as a site-specific amendment to the comprehensive plan in order to obtain a development permit.

¶17 EFSEC's regulations required Horizon to request preemption of the County's laws within 90 days of its decision. Former WAC 463-28-040. However, Horizon sought several extensions of that deadline in an attempt to seek compliance with the County's laws. In June 2003, Horizon submitted an application with the County seeking land use permits for the KVWPP. Over the next seven months, Horizon and the County attempted to site the Project in accordance with the KCC and reported on their progress to EFSEC. Ultimately, the parties could not reach agreement on compliance with the KCC.

¶18 In February 2004, Horizon filed a request for preemption. EFSEC scheduled an adjudicatory hearing for August 2004. After extensive briefing, Horizon and the County filed a joint motion to stay the hearing while the parties focused on another wind energy project application Horizon had filed with the County.[2] In March 2005, Horizon suspended its request for preemption in order to continue to pursue land use consistency with the County. Later, Horizon withdrew its request for preemption altogether and refiled an application for land use permits with the County in its continuing efforts to obtain land use consistency with the KCC.

¶19 The County received Horizon's new permit application in October 2005.[3] The application substantially re-

---

[2] The County eventually approved Horizon's Wild Horse Wind Power Project, thereby obviating the need for preemption for that project.

[3] The application again required Horizon to apply for a development permit, which required a development agreement and a site-specific rezone of the County's existing zoning from Forest and Range and Agriculture to a Wind Farm Resource Overlay Zone. AR at 461-62, 6163-65. Chapter 17.61A KCC also required

duced the KVWPP from 121 turbines to a maximum of 80 turbines in order to comply with the KCC. In addition, the application proposed a 1,000-foot setback of turbines from any property owner not participating in the Project.

¶20 The County began review of the application on January 10, 2006, at a joint hearing of the County Planning Commission (Commission) and the BOCC. The Commission and the BOCC decided to bifurcate the proceedings whereby the Commission would hold public hearings and make its recommendation. Next, the BOCC would hold its own hearings on the same application.

¶21 Horizon made an opening presentation at the initial joint hearing, including extensive testimony and documentation on various issues involving the effect of the Project, including the visual effects, property values, noise impact, insurance coverage, and "shadow flicker"[4] effect. AR 7230-80. The commissioners had the opportunity to question each of Horizon's experts. Horizon noted that through negotiation it had reduced the original project proposal from 120 turbines to 64.

¶22 The Commission held three additional hearings on the application, during which it received public comment and additional testimony from Horizon. After the fourth public hearing on January 30, 2006, the Commission recommended to deny the application.

¶23 Next, the BOCC held a series of its own hearings on March 29 and 30, April 27, and May 3 and 31. During the course of these proceedings it became apparent that the main point of contention between the parties involved the setback requirements of the turbines from the nonparticipating properties. The commissioners asked Horizon why it would not consider a 2,000-foot setback that it understood would eliminate any shadow flicker effect, or a 2,640-5,280-

---

Horizon to apply for an amendment to the county comprehensive plan from a Rural designation to a Wind Resource Overlay District. AR at 461-62, 6163-65.

[4] Horizon's expert explained "shadow flicker" as "the alternating changes in light intensity caused by wind turbine blade as it passes through the sun's line of sight, causing a passing shadow." AR at 7271 (presentation by Andrew Young).

foot setback that would further decrease the visual impact. They also asked if Horizon would consider reorganizing the proposed locations for the 64 turbines within the Project in order to increase setbacks from properties.

¶24 Regarding shadow flicker, Horizon explained that the effect diminishes over distance and disappears at 2,000 feet. Horizon stated that the 1,000-foot setback would adequately mitigate the shadow flicker. Horizon also indicated that the 1,000-foot setback represented a "self-imposed" international standard that related to the mitigation of noise impact. AR at 7837-38, 8135, 8275. Horizon pointed out that requiring a 2,000-foot setback would require it to eliminate rather than mitigate the effect.

¶25 Horizon further explained that it reduced the number of turbines by almost one-half of the original proposal in order to mitigate the visual impact. It pointed out that most of the turbines it proposed to eliminate were located around the periphery of the Project in order to enhance viewpoints. Based on the commissioners' requests, Horizon sent a letter to the BOCC on April 25, 2006, proposing to increase the setback distance from nonparticipating property owners to 1,320 feet. Horizon suggested any further setback requirement would render the Project "economically [un]viable." AR at 8275-76.

¶26 The BOCC again addressed the setback issue at a hearing on May 3, 2006. Based on his own personal observations of an existing wind turbine project, one commissioner suggested that the appropriate setback distance should be between 2,000 feet and 3,300 feet. Another commissioner proposed a 2,500-foot setback requirement based on his own observations at the same site. The third commissioner proposed a setback distance of 3,000 feet, based on his observations of noise and "looming" impact of the existing site. AR at 8151.

¶27 In response to the BOCC's suggestions, Horizon reiterated that the proposed setback of 2,500 feet would render the Project unviable. Horizon sent a letter to the BOCC on May 15, 2006, indicating that a setback require-

ment between 2,000 feet and 3,000 feet would require it to eliminate an additional 43 percent of the already reduced Project.

¶28 On May 19, Horizon sent a letter to the County requesting clear direction as to which commissioner's setback standard to apply when attempting to reconfigure the Project. At a hearing on May 31, the County stated that it was not prepared to provide a specific setback requirement for the Project. Horizon claimed that the Project would not be economically viable if it were reduced in accordance with the BOCC's proposals. Horizon indicated that a 2,000-foot setback from nonparticipating property lines would require Horizon to remove all but 15-20 turbines, which it concluded was not viable. Horizon also asserted that a 2,500-foot setback from nonparticipating residence structures similarly would reduce the project by half. The BOCC scheduled yet another meeting for June 6, 2006, at which time it formally denied the application.

¶29 After the BOCC denied its application, Horizon filed a second request for preemption with EFSEC. EFSEC conducted a series of adjudicative and public hearings in Kittitas County regarding Horizon's application and the preemption of the KCC. After the hearings, EFSEC voted six to one, with the county representative dissenting, to preempt the KCC and to recommend approval of the site certification. EFSEC issued a proposed site certification agreement and sent the recommendation to the governor. The proposed agreement provided for a setback requirement at a distance of four times the height of a turbine.[5]

¶30 The governor directed EFSEC to reconsider the proposed site certification agreement. The governor based her decision "solely . . . on the need to determine on this particular Project whether additional setbacks beyond the four times height (4xh) requirement for non-participating

---

[5] For example, a 330-foot turbine (measured from the tip of the blade at its highest point) would require a 1,320-foot setback and a 440-foot turbine would require a 1,640-foot setback. AR at 11306.

landowners are achievable while allowing the Project to remain economically viable." AR at 11390.

¶31 EFSEC held another public hearing on the issues of setbacks and viability. It purposefully avoided inquiry into economic viability because such a matter was beyond its statutory authority to provide environmental and ecological guidelines. Furthermore, EFSEC determined that additional setback requirements could not resolve the objections of the 16 nonparticipating residents affected by the proposed locations. It concluded that the residents' objections could be satisfied only by cancellation of the Project, which presumably would be economically unviable. However, it did offer that Horizon could "micro-sit[e]" the location of the turbines with the "highest possible consideration" for the nonparticipating residents. AR at 14339-40. EFSEC sent its determination back to the governor with a proposed amendment to include the " 'micro-siting' " process. AR at 11862-63. The governor accepted EFSEC's response and approved the site certification agreement.

## III. *Procedural History*

¶32 Petitioners filed petitions for review of the governor's final determination in Thurston County Superior Court.[6] Petitioners alleged that EFSEC could not preempt county laws regarding the siting of a wind powered energy facility, that EFSEC's members violated the appearance of fairness doctrine, and that EFSEC's decision to preempt the County was not supported by substantial evidence.

¶33 EFSEC filed a motion to certify the petitions to this court pursuant to RCW 80.50.140. ROKT opposed the motion and claimed certain procedural irregularities in the administrative proceedings that were discovered after those proceedings. The County also alleged that EFSEC Chairman Jim Luce exhibited bias in favor of Horizon's application. The superior court allowed the parties to submit declarations and allowed Petitioners to take the depo-

---

[6] The court consolidated the petitions.

sitions of Chairman Luce and EFSEC member Chris Towne. The court found the declarations and depositions to be consistent and denied any further discovery or testimony. The court then determined that certification was warranted under RCW 80.50.140. The court supplemented the record with the additional testimony and certified the petitions to this court.

¶34 Petitioners have challenged this court's jurisdiction to review the petitions directly. The court clerk requested additional briefing on the issue of jurisdiction and scheduled this case for oral argument on the merits as well as the jurisdictional issue.

## ANALYSIS

I. Jurisdictional Issues

A. *The Certification Procedures Established in RCW 80.50.140 Do Not Violate Article IV of the State Constitution*

¶35 Petitioners challenge our jurisdiction to accept the superior court's certification of the petitions for review. Specifically, Petitioners contend that certification procedures under EFSLA violate article IV of the state constitution by conferring unauthorized original jurisdiction upon this court.

■ ¶36 EFSLA authorizes judicial review of the governor's final decision on an application for a site certification. A petition for review must be filed in Thurston County Superior Court. RCW 80.50.140(1). That court shall certify the petition directly to this court if the court determines that certain conditions are met:

(a) Review can be made on the administrative record;

(b) Fundamental and urgent interests affecting the public interest and development of energy facilities are involved which require a prompt determination;

(c) Review by the supreme court would likely be sought regardless of the determination of the Thurston county superior court; and

(d) The record is complete for review.

*Id.* These conditions facially limit certification to cases that do not require fact finding or discovery. If the superior court determines that review cannot be limited to the administrative record because of procedural irregularities in the record, the court must take testimony and determine such factual issues in question before certifying the petition to this court. *Id.* EFSLA instructs that review of the final administrative decision is made in accord with the procedures of the Washington Administrative Procedure Act (APA), chapter 34.05 RCW. RCW 80.50.140(1).[7]

¶37 Petitioners claim that RCW 80.50.140 violates article IV of the state constitution by attempting to expand this court's original jurisdiction. Article IV, section 4 provides, "[t]he supreme court shall have original jurisdiction in habeas corpus, and quo warranto and mandamus as to all state officers, and appellate jurisdiction in all actions and proceedings" where the amount in controversy does not exceed $200. Petitioners assert that the plain language of section 4 does not provide this court with original jurisdiction over the type of action in this case, but rather vests original jurisdiction in the superior courts under article IV, section 6. Br. of Pet'rs ROKT & Lathrop at 21.[8]

■ ■ ¶38 The review under EFSLA, however, invokes the superior court's appellate, not original, jurisdiction. This court has consistently held that a right of direct review in superior court of an administrative decision invokes the limited appellate jurisdiction of the court. *Union Bay Pres. Coal. v. Cosmos Dev. & Admin. Corp.*, 127 Wn.2d 614, 617, 902 P.2d 1247 (1995); *Mader v. Health Care Auth.*, 149

---

[7] While such authorization may seem redundant as the APA provides the exclusive means of judicial review of agency action, the governor is not an " '[a]gency' " under the APA. RCW 34.05.010(2). Therefore, the power to review the governor's decision derives from EFSLA, not the APA.

[8] EFSEC argues that article II, section 26 authorizes the legislature to determine in what courts suits against the State may be brought. Br. of Resp'ts EFSEC & Gregoire at 8-9. However, this provision relates to state immunity and does not directly address appellate and original jurisdiction. That section has traditionally been interpreted to determine in which county the State may be sued.

Wn.2d 458, 468, 70 P.3d 931 (2003); *Fay v. Nw. Airlines, Inc.*, 115 Wn.2d 194, 197, 796 P.2d 412 (1990). While the constitution does not expressly provide for appellate jurisdiction of agency action in superior court, this court has recognized that the superior courts have inherent authority to review administrative decisions for arbitrary and capricious action under the discretionary writ of certiorari. *Saldin Sec., Inc. v. Snohomish County*, 134 Wn.2d 288, 292, 949 P.2d 370 (1998); *Pierce County Sheriff v. Civil Serv. Comm'n*, 98 Wn.2d 690, 694, 658 P.2d 648 (1983); *Bridle Trails Cmty. Club v. City of Bellevue*, 45 Wn. App. 248, 251-52, 724 P.2d 1110 (1986) ("This review by 'constitutional' or 'common law' certiorari is not full appellate review on the merits." (footnote omitted)); CONST. art. IV, § 6 (recognizing power of superior courts to issue writs). Allowing only limited appellate review over administrative decisions, rather than original or appellate jurisdiction as a matter of right, "serves an important policy purpose in protecting the integrity of administrative decisionmaking." *King County v. Wash. State Boundary Review Bd.*, 122 Wn.2d 648, 668, 860 P.2d 1024 (1993).

¶39 The legislature may confer such limited appellate review by statute. *Union Bay*, 127 Wn.2d at 617; *City of Seattle v. Pub. Employment Relations Comm'n*, 116 Wn.2d 923, 926, 809 P.2d 1377 (1991); *Deschenes v. King County*, 83 Wn.2d 714, 716, 521 P.2d 1181 (1974). For example, we have recognized that the review procedures established under the APA create appellate jurisdiction in the superior court, which requires compliance with all statutory procedural requirements before such jurisdiction is properly invoked. *Union Bay*, 127 Wn.2d at 617-18.

¶40 As the superior court asserts appellate jurisdiction to review administrative decisions, the certification of a petition for review of an administrative decision likewise invokes this court's appellate jurisdiction. Indeed, this court sits in the same place as the superior court when reviewing a superior court's direct review of an administrative decision. *Heinmiller v. Dep't of Health*, 127 Wn.2d 595,

601, 903 P.2d 433, 909 P.2d 1294 (1995) (citing *Tapper v. Employment Sec. Dep't*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993)). We apply the same review to administrative decisions as the superior courts. *Farm Supply Distribs., Inc. v. Wash. Utils. & Transp. Comm'n*, 83 Wn.2d 446, 448, 518 P.2d 1237 (1974) ("Each level of the judiciary actually reviews administrative decisions in an appellate capacity."). EFSLA's certification procedures do not change the nature of the jurisdiction used to review the administrative decision. In fact, the certification procedures further limit this court's review by requiring that the superior court determine all factual issues related to alleged procedural irregularities before certifying the petition to this court. RCW 80.50.140(1).

¶41 Article IV vests general appellate jurisdiction in this court. The plain language of the constitution provides appellate jurisdiction in this court over "all actions and proceedings." CONST. art. IV, § 4. As this provision is not self-executing, the legislature may properly confer appellate jurisdiction on this court. *See Robison v. LaForge*, 170 Wash. 678, 679, 17 P.2d 843 (1932) ("The provision of our constitution, Art. IV, § 4, conferring the right of appeal, is not self-executing, but receives its vitality from legislative enactment."); *Kreidler v. Eikenberry*, 111 Wn.2d 828, 836, 766 P.2d 438 (1989). Therefore, our review of the administrative decision in this case is properly within our appellate jurisdiction.

¶42 Petitioners rely on *North Bend Stage Line, Inc. v. Department of Public Works*, 170 Wash. 217, 16 P.2d 206 (1932), in which this court struck down a statute that attempted to authorize direct review in this court of an order of the Department of Public Works. The court held that review of the department's order constituted original rather than appellate jurisdiction. *Id.* at 222. The court opined that " 'all actions and proceedings' " in article IV, section 4 means jurisdiction over decisions "of a purely judicial nature, which have been determined in some judicial court established by the constitution or in pursuance

thereof." *Id.* Such jurisdiction did not include review of the department's order.

¶43 The court went on to explain that the constitution vested superior courts with original jurisdiction over " ' "such special cases and proceedings as are not otherwise provided for." ' " *Id.* at 225 (quoting *Winsor v. Bridges*, 24 Wash. 540, 547, 64 P. 780 (1901) (quoting CONST. art. IV, § 6)). Therefore, the legislature could not create jurisdiction over such matters in the supreme court as a matter of right to the extent that it would deprive the superior court of its exclusive jurisdiction.[9] The court concluded that the statute in question violated article IV because it created a right to seek direct review of the department's order in this court, which necessarily deprived the superior court of its original jurisdiction.[10] *Id.* at 227-28.

¶44 *North Bend* is distinguishable from the present case. Unlike the statute at issue in *North Bend*, EFSLA creates a right of direct review in superior court, not this court. As discussed above, such review invokes the superior court's appellate jurisdiction. Therefore, EFSLA does not invoke this court's original jurisdiction.

¶45 Furthermore, the *North Bend* court did not address the certification procedure at issue here. While the

---

[9] The parties do not raise and therefore we take no position on the issue of whether article IV actually prohibits the legislature from expanding the jurisdiction of this court where such expansion does not infringe on the exclusive jurisdiction of another court. *See In re Elliott*, 74 Wn.2d 600, 604, 446 P.2d 347 (1968) ("[T]he state constitution is a limitation upon the actions and powers of the legislature, instead of a grant of power. So far as the power of the legislature is not limited by the constitution, it is unrestrained.").

[10] Petitioners also rely on *Department of Highways v. King County Chapter, Washington Environmental Council*, 82 Wn.2d 280, 510 P.2d 216 (1973), but mainly for its citations to *North Bend* in dicta. The holding in *Department of Highways* involved only an issue of statutory construction. The court held that the APA's procedures regarding direct review of agency actions controlled over another statute that permitted direct review to the Court of Appeals. After determining that the review procedure created by statute did not permit direct review of an administrative decision in the Court of Appeals, the court expressly declined to reach the question of whether the legislature may provide for direct review of an administrative decision to the Court of Appeals. *Id.* at 287 ("Nor are we faced with the question whether the legislature may provide for an appeal direct to the Court of Appeals from an administrative decision and thus oust the superior court of original jurisdiction to review decisions of inferior tribunals.").

certified petition does not present this court with review of a "purely judicial" decision, the certification procedure under RCW 80.50.140 merely provides a vehicle through which the superior court transfers cases of limited appellate jurisdiction to this court. We already have a rule that permits the Court of Appeals to take direct review of a final decision by an administrative agency. RAP 2.1(c). This rule permits direct review of an agency decision by the Court of Appeals under the procedures of the APA. RCW 34-.05.518(2). The criteria for certification to the Court of Appeals closely resemble the procedures established under EFSLA.[11]

¶46 Similarly, we have long asserted our own authority to review cases transferred from the Court of Appeals. RAP 4.4; *see* RCW 2.06.030 (authorizing the transfer of a case from the Court of Appeals in order to promote the "orderly administration of justice"). We also have upheld the statutorily created procedure for this court to accept certified questions from federal courts. *In re Elliott*, 74 Wn.2d 600, 604-05, 446 P.2d 347 (1968); *see* Federal Court Local Law Certificate Procedure Act, ch. 2.60 RCW. Because the superior court can certify direct review to the Court of Appeals under RAP 2.1(c) and this court can transfer a case from the Court of Appeals, RAP 4.4, this court already possesses the authority to apply direct review of final decisions of administrative agencies.

---

[11] Pursuant to RCW 34.05.518(2):

The superior court may certify a case for direct review only if the judicial review is limited to the record of the agency proceeding and the court finds that:

   (a) Fundamental and urgent issues affecting the future administrative process or the public interest are involved which require a prompt determination;

   (b) Delay in obtaining a final and prompt determination of such issues would be detrimental to any party or the public interest;

   (c) An appeal to the court of appeals would be likely regardless of the determination in superior court; and

   (d) The appellate court's determination in the proceeding would have significant precedential value.

¶47 On the other hand, the certification process under RCW 80.50.140 differs from the other certification procedures described above by suggesting that this court must review a petition certified from the superior court. That section provides that "[u]pon certification, the supreme court *shall* assign the petition for hearing at the earliest possible date, and it *shall* expedite its review and decision in every way possible." RCW 80.50.140(1) (emphasis added). This language is problematic because the constitution prohibits the legislature from depriving this court of its power to review a decision of the superior court. *Saldin Sec.*, 134 Wn.2d at 295-96 ("statutory limitation of judicial review cannot interfere with the court's constitutionally inherent power of review"). Under RCW 80.50-.140(1), the superior court decides whether a petition meets certain criteria before certifying the case to this court. RCW 80.50.140(1)(a)-(d). The legislature cannot deprive this court of its authority to review the superior court's decision to certify the case.

¶48 In order to avoid this apparent constitutional infirmity, we construe the mandatory "shall" under RCW 80.50.140 as permissive, in accord with this court's constitutional power to review a decision of the superior court. We may interpret the mandatory "shall" as permissive if it otherwise would render a statute unconstitutional. *Elliott*, 74 Wn.2d at 607 (" 'The word "shall" must also be construed as permissive when the statute can thereby be upheld, if a construction to the contrary could render it unconstitutional.' " (quoting 82 C.J.S. *Statutes* § 380, at 882 (1953))). In *Elliott*, this court recognized that "even if the statute is intended to be imperative it will be construed as discretionary because the statute is subject to the implied limitations of the constitution as a matter of construction." *Id.* at 608. Under this permissible construction, RCW 80.50.140 does not require us to accept certification from the superior court, and we may determine whether or not to accept certification. This simply recognizes the constitutional limitations on the legislature's power and does not otherwise limit the legislative intent under EFSLA.

¶49 We hold that the certification procedures under RCW 80.50.140 properly invoke this court's appellate jurisdiction. Furthermore, we hold that the procedures do not require us to accept certification from the superior court, and we retain the discretion to accept or decline certification from that court.

B. *The Superior Court Properly Certified this Case for Review*

¶50 Having determined that we have jurisdiction to review the certified petitions, we must decide whether to accept certification from the superior court. The superior court decided that the petitions met the four conditions under RCW 80.50.140(1) and certified the petitions to this court. As the trial court's decision to certify invokes this court's own discretion to accept jurisdiction, we review the superior court's decision de novo. *See Crosby v. Spokane County*, 137 Wn.2d 296, 301, 971 P.2d 32 (1999) ("The issue whether a court has jurisdiction is a question of law subject to de novo review.").

¶51 The superior court initially determined that review could be made on the administrative record, RCW 80.50.140(1)(a), because Petitioners had alleged procedural irregularities in the application process. Under RCW 80.50.140(1), if the court determines that review cannot be limited to the administrative record because of alleged irregularities in the administrative procedures, then it shall "take testimony and determine such factual issues raised by the alleged irregularities" before certifying the petition for review. Petitioners allege that the superior court erred in certifying the petitions because the superior court "failed to take the requisite testimony and make factual determinations" regarding their allegations of procedural irregularities. Br. of Pet'rs ROKT & Lathrop at 24. We review the trial court's decision to limit testimony under a relevance standard as that court received and evaluated the evidence in question. *Roberts v. Atl. Richfield Co.*, 88 Wn.2d 887, 893, 568 P.2d 764 (1977). While appellate

review of administrative decisions is generally limited to the administrative record, we will look to the superior court record where that court has taken additional evidence necessary for review or has examined an issue not raised in the administrative record. *See Waste Mgmt. of Seattle, Inc. v. Utils. & Transp. Comm'n*, 123 Wn.2d 621, 633-34, 869 P.2d 1034 (1994).

¶52 The substance of the alleged irregularities relate to Petitioners' claims that Chairman Luce engaged in a conflict of interest and improper ex parte communications and exhibited bias in favor of EFSEC's preemption authority. The court granted Petitioners the ability to supplement the record with the declarations and depositions obtained through discovery in order to support their allegations of irregularity. The court reviewed the evidence produced and found no material disputed issue of fact that would require further evidentiary hearings. The court did not make a specific finding of procedural irregularity but determined that the record was complete for this court's substantive review of Petitioners' allegations. The court entered an order to supplement with the testimony for certification.

¶53 A court may limit the amount of testimony that it will accept. The court's decision to receive testimony has practical limits. *Roberts*, 88 Wn.2d at 893 ("The elements by which relevancy is measured include whether the testimony would have a tendency to mislead, distract, waste time, confuse or impede the trial, or be too remote either as to issues or in point of time."). Given the court's authority to limit testimony on relevance grounds, we do not believe the court acted outside its discretion.

¶54 The court permitted Petitioners to supplement the record with declarations and deposition transcripts from the key people involved in the allegations. Declarations and depositions constitute testimony. BLACK'S LAW DICTIONARY 1514 (8th ed. 2004) ("[T]estimony" means "[e]vidence that a competent witness under oath or affirmation gives at trial or in an affidavit or deposition."); *Hohnsbehn v. Bd. of Trs. of Police Pension Fund*, 304 Ill. App. 3d 564, 568,

711 N.E.2d 323, 238 Ill. Dec. 220 (1999) ("The word 'testimony' means much more than mere in-person testimony at the hearing." (quoting BLACK'S LAW DICTIONARY 1476 (6th ed. 1990))). Therefore, RCW 80.50.140(1) did not require the superior court to conduct an evidentiary hearing or to allow Petitioners' to conduct in-court interrogation of witnesses.

¶55 The testimony permitted by the court provided Petitioners with a sufficient record to make their allegations of impropriety against the EFSEC council members. Petitioners argue that they were entitled to take more testimony but do not assert that they need to present additional facts in order to support their claims. The factual issues giving rise to their claim are documented in the supplemental record. The supplemental record establishes the acts taken by the EFSEC council members. The only question remaining is whether such conduct amounts to a violation of law as alleged by Petitioners. This is a purely legal question that can be determined from the existing record. Taking additional testimony is not required for such a decision and would only waste time. Therefore, the court did not err in limiting the testimony to the declarations and depositions.

¶56 Upon supplementing the record, the court determined that the record was complete for review in satisfaction of RCW 80.50.140(1)(d). The court went on to determine the remaining criteria under RCW 80.50.140(1). The court found that the petition involved fundamental and urgent interests under RCW 80.50.140(1)(b). We agree. The legislature has recognized public interests in providing energy at a reasonable cost, RCW 80.50.010(3), and avoiding costly duplication in the siting process and ensuring that decisions are made timely and without unnecessary delay, RCW 80.50.010(5). Such public interests are present in this case, requiring prompt review. Petitioners question the State's authority to site energy facilities under EFSLA, which has been in effect for over 30 years. A delay in finally determining such authority will result in uncertainty for all existing and pending siting projects. Such uncertainty could lead to delay in the construction and operation of

energy facilities and ultimately restrict the availability of energy at reasonable costs in the state.

¶57 The superior court also determined that the parties would likely seek review in this court regardless of its determination. RCW 80.50.140(1)(c). Again, we agree. The stakes in this case are high, pitting the jurisdiction of a multidepartment state council against county jurisdiction over siting energy facilities. The winner gets control over the siting of energy facilities. Whoever lost in superior court would have great motivation to seek review in this court in order to preserve its jurisdiction.

¶58 We hold that the testimony taken in superior court sufficiently supplemented the record for effective review by this court and does not require us to remand for further fact finding on alleged procedural irregularities. We further hold that the petitions for review meet the conditions under RCW 80.50.140(1), and therefore we accept certification from the superior court. We will review Petitioners' substantive claims on the record certified by the superior court.

II.   Substantive Issues

A.   *Scope of Review under the APA*

¶59 Petitioners raise several challenges regarding the authority and propriety of the State's decision to preempt the County's land use laws in order to site an energy facility. Before reaching Petitioners' substantive claims, we must determine the scope of our review of that decision. EFSLA creates a right of judicial review of the "final decision" made on an application for site certification, pursuant to the procedures of the APA. RCW 80.50.140(1). However, that section does not define whether the final decision relates only to the governor's actual decision itself or also includes review of the administrative process followed by EFSEC in making its recommendation to the governor.

¶60 The governor makes the very last decision on an application for certification, which simply requires her to

approve or reject the application in her discretion. RCW 80.50.100(2). However, EFSLA provides no guidelines or procedures for how the governor may exercise her discretion to finally approve or reject the application. Therefore, if review were limited to the actual last decision made, there would essentially be nothing to review.

¶61 As EFSLA does not determine the scope of review, we look to the APA for guidance. Under the APA, the approval of a site certification falls within the definition of a " '[l]icense.' " RCW 34.05.010(9)(a). " 'Licensing' includes the agency process respecting the issuance . . . of a license." RCW 34.05.010(9)(b). Licensing focuses on the process or procedures used by the issuing agency. In addition, an " '[a]djudicative proceeding' " includes "all cases of licensing . . . in which the granting of an application [for a license] is contested by a person having standing to contest under the law." RCW 34.05.010(1). Therefore, we consider the governor's approval of the certification as an " '[a]djudicative proceeding' " under the APA. As such, this court's review should include the process used in approving the certification.

¶62 The APA provides standards for reviewing orders issued in adjudicative proceedings. RCW 34.05.570(3). While EFSEC did not technically issue an order after holding its public hearing, EFSLA required EFSEC to conduct the hearing as an adjudicative proceeding. RCW 80.50.090(3). Under the APA, review of adjudicative proceedings is limited to the following concerns:

(a) The order, or the statute or rule on which the order is based, is in violation of constitutional provisions on its face or as applied;

(b) The order is outside the statutory authority or jurisdiction of the agency conferred by any provision of law;

(c) The agency has engaged in unlawful procedure or decision-making process, or has failed to follow a prescribed procedure;

(d) The agency has erroneously interpreted or applied the law;

(e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this chapter;

(f) The agency has not decided all issues requiring resolution by the agency;

. . . .

(h) The order is inconsistent with a rule of the agency unless the agency explains the inconsistency by stating facts and reasons to demonstrate a rational basis for inconsistency; or

(i) The order is arbitrary or capricious.

RCW 34.05.570(3). This list governs the scope of our review of Petitioners' substantive claims. We address each claim individually.

B. *EFSLA Governs the Siting of an Energy Facility that Exclusively Uses Wind Power*

¶63 Petitioners claim that EFSLA does not confer jurisdiction on EFSEC to preempt the County's land use and zoning laws regarding the siting of wind energy facilities. This issue falls within RCW 34.05.570(3)(b), regarding the statutory authority or jurisdiction of an agency.

¶64 By its very terms, EFSLA applies to an energy facility that exclusively uses wind power, regardless of generating capacity. EFSLA defines the scope of energy facilities covered by the statute. It expressly applies "to the construction, reconstruction, or enlargement of a new or existing energy facility that *exclusively uses alternative energy resources* and chooses to receive certification under this chapter, regardless of the generating capacity of the project." RCW 80.50.060(2) (emphasis added). The "alternative energy resources" language was added in 2001. LAWS OF 2001, ch. 214, § 2. The same year, the legislature defined " '[a]lternative energy resource' " as "(a) Wind; (b) solar energy; (c) geothermal energy; (d) landfill gas; (e) wave or tidal action; or (f) biomass energy based on solid organic

fuels from wood, forest, or field residues, or dedicated energy crops." RCW 80.50.020(18). The KVWPP proposes to use wind energy to generate electricity and therefore falls within the plain meaning of RCW 80.50.060(2). *See Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002) ("[I]f the statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent.").

¶65 Petitioners take a different view. Their interpretation would have us look to the definition of an "energy facility" as defining the scope of projects covered under EFSLA because RCW 80.50.060(2) applies to an *"energy facility* that exclusively uses alternative energy resources." (Emphasis added.) In their view, any facility that uses an alternative energy resource still must fit within the meaning of an "energy facility" as defined under EFSLA.

¶66 EFSLA defines an " '[e]nergy facility' " as "an energy plant or transmission facilit[y]." RCW 80.50.020(11). The definition for a " '[t]ransmission facility' " is totally inapplicable here. RCW 80.50.020(7). EFSLA defines an " '[e]nergy plant' " as one of five kinds of facilities distinguished by the kind of energy used and the output generated. RCW 80.50.020(15)(a)-(e). Subsection (a) refers to a thermal power plant, subsections (b) and (d) refer to facilities that use natural gas, and subsections (c) and (e) refer to facilities that use petroleum. The definition makes no reference to any of the " '[a]lternative energy resource[s]' " defined in RCW 80.50.020(18).

¶67 Petitioners' reading of RCW 80.50.060(2) would exclude at least wind and wave action projects from coverage under EFSLA. Under Petitioners' reading, RCW 80-.50.060(2) would limit an energy facility that exclusively uses alternative resources to a facility that uses thermal, petroleum, or natural gas. While several of the alternative energy resources enumerated in RCW 80.50.020(18) arguably could fit into the meaning of thermal power, resources such as wind and wave action would not.

¶68 We cannot accept Petitioners' interpretation as it would render meaningless the legislature's explicit inclusion of wind as an alternative energy resource, as well as any other alternative energy that was not a thermal, gas, or petroleum based energy resource. The definition of an energy facility that uses alternative energy resources must apply to those alternative energy resources expressly defined in EFSLA in order to give the statute meaning. *State v. J.P.*, 149 Wn.2d 444, 450, 69 P.3d 318 (2003). EFSLA instructs that the definitions section applies throughout the statute "unless the context clearly requires otherwise." RCW 80.50.020. The context of RCW 80.50.060(2) clearly requires that an "energy facility that exclusively uses alternative energy resources" applies to a wind energy facility.[12]

¶69 Petitioners argue that the phrase "alternative energy resources" must relate to the existing definition of an energy facility because RCW 80.50.060(2) exempts such resources from the output requirements for energy facilities under RCW 80.50.020(11) and (15). However, our interpretation does not render meaningless the last phrase of RCW 80.50.060(2). The exemption from any output requirement simply makes clear the legislature's intent to apply EFSLA's siting procedures to all alternative energy projects. The language expressly defines the scope of coverage rather than implying the scope of coverage by silence. In other words, the legislature intended to be as clear as possible that no alternative energy project would be too small for EFSLA's siting process.

¶70 We hold that EFSLA applies to energy facilities that exclusively use wind power. As such, EFSLA governs the KVWPP application.

---

[12] Furthermore, the legislature amended the definition section in 2007 to indicate that alternative energy resources apply beyond the strict definitional limits of an energy facility. EFSLA now defines a " '[s]ite' " as "any proposed or approved location of an energy facility, alternative energy resource, or electrical transmission facility." RCW 80.50.020(4); LAWS OF 2007, ch. 325, § 1.

C. *The Growth Management Act Did Not Supersede EFSEC's Preemption Authority under EFSLA*

¶71 Petitioners argue that EFSEC could not exercise its preemption authority over the County because the Growth Management Act (GMA), chapter 36.70A RCW, required EFSEC to comply with the County's comprehensive land use plan and regulations. Respondents EFSEC and Sagebrush contend that the GMA did not repeal EFSLA, and therefore the specific preemption authority under EFSLA governs over the GMA. Review of this issue also falls within RCW 34.05.570(3)(b).

¶72 EFSLA provides that "[t]he state hereby preempts the regulation and certification of the location, construction, and operational conditions of certification of the energy facilities included under RCW 80.50.060 as now or hereafter amended." RCW 80.50.110(2). As discussed above, RCW 80.50.060(2) includes energy facilities that use alternative energy resources, including wind power. EFSEC relied on this authority to preempt the County's land use laws in this case.

¶73 Twenty years after enacting EFSLA, the legislature enacted the GMA in order to coordinate and plan economic growth and development among communities, local governments, and corporations. RCW 36.70A.010. The legislature amended the GMA in 2002 to recognize the importance of protecting rural lands and economies. RCW 36.70A.011. The GMA requires that "[s]tate agencies shall comply with the local comprehensive plans and development regulations and amendments thereto adopted pursuant to this chapter except as otherwise provided in [provisions under chapter 71.09 RCW]." RCW 36.70A.103. Petitioners contend that this language supersedes and therefore governs over the preemption language in EFSLA.

¶74 We attempt to read statutes governing the same subject matter in pari materia. *Hallauer v. Spectrum Props., Inc.*, 143 Wn.2d 126, 146, 18 P.3d 540 (2001) ("Such statutes 'must be construed together.'" (internal quotation

marks omitted) (quoting *In re Pers. Restraint of Yim*, 139 Wn.2d 581, 592, 989 P.2d 512 (1999))). However, these two statutes present an apparent contradiction. A state agency cannot both preempt local laws and comply with such laws at the same time.

¶75 Fortunately, the rules of statutory construction provide a way to resolve this tension. Under the general-specific rule, a specific statute will prevail over a general statute. *Wark v. Wash. Nat'l Guard*, 87 Wn.2d 864, 867, 557 P.2d 844 (1976) ("It is the law in this jurisdiction, as elsewhere, that where concurrent general and special acts are in pari materia and cannot be harmonized, the latter will prevail, unless it appears that the legislature intended to make the general act controlling."). As this court recognized in *Wark*, "It is a fundamental rule that where the general statute, if standing alone, would include the same matter as the special act and thus conflict with it, the special act will be considered as an exception to, or qualification of, the general statute, whether it was passed before or after such general enactment." *Id.*; *see State v. Conte*, 159 Wn.2d 797, 803, 154 P.3d 194, *cert. denied*, 552 U.S. 992 (2007). Furthermore, if the general statute was enacted after the specific statute, this court will construe the original specific statute as an exception to the general statute, unless expressly repealed. *Wark*, 87 Wn.2d at 867 ("If it was passed before the general statute, the special statute will be construed as remaining an exception to its terms, unless it is repealed by express words or by necessary implication."); *State ex rel. Dep't. of Pub. Serv. v. N. Pac. Ry.*, 200 Wash. 663, 668, 94 P.2d 502 (1939) (" 'It is elementary that a general statute or rule, though subsequently enacted or promulgated, does not affect a special statute or rule.' " (internal quotation marks omitted) (quoting *In re W. Barton St. Sewer*, 163 Wash. 645, 647, 1 P.2d 858 (1931))).

¶76 Applying the general-specific rule to the statutes at issue, EFSLA represents the specific statute and the GMA represents the general one. EFSLA governs a discrete and

specific function of certifying sites for the construction and operation of energy facilities. On the other hand, the GMA applies to the comprehensive planning and management of land within counties and cities. RCW 36.70A.040. Therefore, EFSLA can be properly read as a specific exception to the general goals and procedures of the GMA.

¶77 The GMA does not expressly repeal EFSEC's preemption power under RCW 80.50.110(2). The GMA provides that the State maintains "authority to site any other essential public facility under RCW 36.70A.200 in conformance with local comprehensive plans and development regulations adopted pursuant to chapter 36.70A RCW." RCW 36.70A.103. RCW 36.70A.200(1) requires a county's comprehensive plan to include a process for siting "essential public facilities," which it refers to as airports, schools, transportation, correctional, waste, inpatient, substance abuse, mental health, group home, and transitional facilities. The GMA makes no mention of an energy facility nor gives any express indication that the legislature intended to repeal EFSEC's preemption power to site energy facilities.

¶78 The regulations adopted by CTED pursuant to the GMA further support this conclusion. The legislature designated CTED with the authority to promulgate regulations implementing the GMA. RCW 36.70A.190(4)(b). The legislature also assigned CTED to provide administrative and staff support for EFSEC. RCW 80.50.030(2)(b). CTED's duties under both statutes give it a unique and authoritative perspective of the relationship between EFSLA and the GMA. We afford deference to such an agency's rules. *Green River Cmty. Coll. Dist. No. 10 v. Higher Educ. Pers. Bd.*, 107 Wn.2d 427, 438, 730 P.2d 653 (1986) ("[A] heightened degree of deference is appropriate where the agency's construction of a statute is within the agency's field of expertise.").

¶79 Within its authority to promulgate the regulations for the GMA, CTED recognized that its regulations "should accommodate situations where the state has explicitly preempted all local land use regulations, as for example, in

the siting of major energy facilities under RCW 80.50.110." WAC 365-195-745(1). Therefore, CTED expressly recognizes that the GMA must be read in conformity with EFSLA.[13] This recognition confirms our interpretation that the GMA does not supersede or repeal EFSEC's preemption powers under EFSLA.

D. *The Final Environmental Impact Statement Adequately Considered the Mitigation of Visual Impact Caused by the KVWPP*

¶80  The County argues that EFSEC violated the State Environmental Policy Act (SEPA), chapter 43.21C RCW, by producing an inadequate final environmental impact statement (FEIS) for consideration of the KVWPP application. Review of this issue falls within RCW 34.05-.570(3)(c) and (f). This court evaluates the adequacy of a FEIS under the "rule of reason" standard. *Klickitat County Citizens Against Imported Waste v. Klickitat County*, 122 Wn.2d 619, 633, 860 P.2d 390, 866 P.2d 1256 (1993). Under this standard, a FEIS "must present decisionmakers with a 'reasonably thorough discussion of the significant aspects of the probable environmental consequences' of the agency's decision." *Id.* (quoting *Cheney v. City of Mountlake Terrace*, 87 Wn.2d 338, 344-45, 552 P.2d 184 (1976) (citing *Trout Unlimited v. Morton*, 509 F.2d 1276, 1283 (9th Cir. 1974))).

¶81 The County alleges that the FEIS is deficient because it does not analyze specific turbine setback distances as a mitigation measure for the visual impact of the turbines. The County notes that WAC 197-11-440(6) mandates that the "[a]ffected environment, significant impacts,

---

[13] In 2006, the legislature amended EFSLA in conformity with CTED's interpretation. EFSLA now expressly requires EFSEC to determine whether a project is consistent with laws adopted under the GMA as the initial step in the preemption analysis. Under RCW 80.50.090(2), EFSEC must hold "a public hearing to determine whether or not the proposed [project] is consistent and in compliance with city, county, or regional land use plans or zoning ordinances" before making its decision to preempt such laws. The 2006 amendment specifically added the GMA to the definitions for " '[l]and use plan' " and " '[z]oning ordinance.' " RCW 80.50.020(16), (17).

and mitigation measures" section of a FEIS discuss reasonable measures that would significantly mitigate significant environmental impacts of the project and indicate the intended environmental benefits of those mitigation measures. However, a FEIS does not require inclusion of specific remedies for each environmental impact. The basic purpose for requiring a FEIS is " 'to require local governments to consider total environmental and ecological factors to the fullest extent when taking "major actions significantly affecting the quality of the environment." ' " *Wash. State Boundary Review Bd.*, 122 Wn.2d at 659 (quoting *Lassila v. City of Wenatchee*, 89 Wn.2d 804, 813, 576 P.2d 54 (1978) (quoting RCW 43.21C.030(c))).

¶82 The FEIS establishes the elementary fact that greater distances mitigate the visual impact of turbines. The FEIS submitted for the KVWPP carefully discusses the turbines' potential visual impacts in a 43-page section. AR at 10065-107. That section clearly indicates that locating turbines at greater distances from viewers reduces visual impact of those turbines. It determines that the turbines have a greater impact on viewers the closer they are located to the viewer. AR at 10066 (designating 0.5 miles or fewer "[h]igh" viewer sensitivity, 0.5 to 5 miles "[m]oderate," and greater than 5 miles "[l]ow"); AR at 10096-97 (noting that certain turbines would be "highly visible" because viewers would see them at "relatively close range"). The FEIS specifically evaluated more than a dozen viewpoints, which accounted for the distance of the viewers from the turbines. *See* AR at 10073-99.

¶83 The FEIS does not violate the "rule of reason" merely because it does not list "moving turbines away from every possible viewpoint" as a potential mitigation measure. The FEIS served its function of presenting "decisionmakers with a 'reasonably thorough discussion' " of the visual impact of the project. *Klickitat County Citizens*, 122 Wn.2d at 633 (quoting *Cheney*, 87 Wn.2d at 344-45). Therefore, we hold that the FEIS did not fail to address the mitigation of the visual impact of the KVWPP.

¶84 EFSEC's use of evidence outside the FEIS in its final certification decision does not render the FEIS inadequate. The County points out that EFSEC eventually approved a setback of four times turbine height, relying on testimony from the applicant's expert. County's Opening Br. at 40-41. The County takes issue with the fact that such a setback distance was not specifically discussed in the FEIS. FEISs are critical evaluative tools for decision makers, but nothing in SEPA requires decision makers to rely solely on the information contained in the FEISs when making decisions. The FEIS here was adequate, and EFSEC used it properly.

E. *EFSEC Members DNR, CTED, and Chairman Luce Did Not Violate the Appearance of Fairness Doctrine*

¶85 Petitioners allege that participation by DNR and CTED on EFSEC violated the appearance of fairness doctrine. Petitioners also allege that Chairman Luce violated the doctrine by engaging in ex parte communications and making biased statements in favor of EFSEC's preemption authority. Review of this issue falls within RCW 34.05-.570(3)(c) for engaging in unlawful decision making or failing to follow prescribed procedures.

¶86 The appearance of fairness doctrine provides that "[m]embers of commissions with the role of conducting fair and impartial fact-finding hearings must, as far as practical, be open-minded, objective, impartial, free of entangling influences, capable of hearing the weak voices as well as the strong and must also give the appearance of impartiality." *Narrowsview Pres. Ass'n v. City of Tacoma*, 84 Wn.2d 416, 420, 526 P.2d 897 (1974). The doctrine applies only "as far as practical" to ensure fair and objective decision making by administrative bodies. *Id.* The practicality of the appearance of fairness will largely be determined by the procedures being applied.

¶87 Petitioners claim that DNR violated the doctrine by participating on EFSEC when it had a financial interest in the KVWPP. This claim relates to the fact that DNR leased

state land to Horizon as part of the Project. Petitioners further claim that CTED violated the doctrine by participating on EFSEC while participating as a party intervenor in the site certification application process. Before reaching the substance of these allegations, we must first determine if the doctrine applies to the participation of the departmental seats created by EFSLA.

¶88 The appearance of fairness doctrine does not protect constitutional rights.[14] *City of Bellevue v. King County Boundary Review Bd.*, 90 Wn.2d 856, 863, 586 P.2d 470 (1978) ("Our appearance of fairness doctrine, though related to concerns dealing with due process considerations, is not constitutionally based."). Therefore, the fairness of a decision-making body is measured by how the legislature chose to structure the administrative body.

¶89 DNR and CTED participated on EFSEC by statutory mandate. RCW 80.50.030(3)(a) provides that "[t]he council *shall* consist of . . . (iii) Department of community, trade, and economic development; . . . and (v) Department of natural resources." (Emphasis added.) Therefore, the legislature intended DNR and CTED to participate on the council and EFSEC does not have the authority to determine its own membership. The appearance of fairness doctrine does not override the legislature's decision to include these agencies on EFSEC.

¶90 The legislature did not intend to exclude interested parties from sitting on EFSEC. The legislature provided a right for a county to appoint a representative to EFSEC when it considered an application located in that county. RCW 80.50.030(4). Without question, any county in which an energy facility is proposed would have a great interest in the decision whether to preempt the county's authority to site such a facility. Indeed, in this case, the County ap-

---

[14] The heading of the ROKT brief on this issue claims "EFSEC Violated Established Appearance of Fairness and Due Process Requirements of Fair and Impartial Hearing." Br. of Pet'rs ROKT & Lathrop at 25. However, its entire argument is premised on the appearance of fairness doctrine, without any mention of the constitution or due process.

pointed a representative to EFSEC and later intervened as an interested party. The presence of the County on EFSEC demonstrates that the legislature envisioned EFSEC to include a variety of perspectives and interested parties in the decision-making process. We will not disturb the legislature's decision.

¶91 Of course, the appearance of fairness doctrine certainly can be used to challenge an individual's participation as an administrative decision maker. EFSLA does not mandate the appointment of a particular *person* by DNR or CTED. However, Petitioners do not challenge the individual representatives of DNR or CTED who sat on the council.[15]

¶92 Petitioners allege that Luce himself violated the appearance of fairness on several grounds related to correspondence that they discovered after the application process had been completed. Petitioners point to an e-mail sent from Luce on February 24, 2004, which they claim indicated his bias and prejudice in this case. Ex. 14 to Dep. of Luce (Jan. 18, 2008). However, Petitioners merely parse out words from this document without explaining their meaning in context. For example, the County refers to Luce's comments that the KCC " 'circumvented' " and " 'subverted' " EFSEC, "and so warranted preemption." County's Opening Br. at 15; Ex. 14 to Dep. of Luce. Petitioners fail to explain how these comments allegedly show bias or prejudice.

¶93 The record indicates that the KCC Wind Farm Resource Overlay Zone ordinance clearly conflicted with EFSEC's jurisdiction, which is the very reason why EFSEC required Horizon to seek compliance with the County before requesting preemption. Furthermore, the County simply refers to a comment made by Luce characterizing the County's position as " 'very unpersuasive,' " but the County

---

[15] During EFSEC's proceedings, Petitioners moved for disqualification of DNR and CTED. EFSEC followed the procedures of the APA and determined not to disqualify either member. RCW 34.05.425(3). Petitioners do not seek review of that determination.

fails to explain anything about the context in which that comment was made. County's Opening Br. at 15. The superior court provided Petitioners the opportunity to depose Luce regarding these comments to allow Petitioners to follow up on their claims of bias and partiality. This court need not indulge Petitioners in searching for any bias or prejudice in these comments.

¶94 Petitioners cite to another e-mail sent by Luce in which he wrote, "if we don't preempt we are effectively out of business as a 'State siting Council.'" Ex. 8 to Dep. of Luce. In his deposition, Luce explained that the facts of this case so clearly required preemption as authorized under EFSLA that if it did not preempt the County, then EFSEC would not be following its legislative mandate and should close down. Dep. of Luce at 36-37. Such comments accurately reflect the law under which EFSEC was created. RCW 80.50.010(5) specifically instructs EFSEC to avoid costly duplication in the siting process, presumably through its preemption power. Petitioners' other examples of bias are similarly unpersuasive. See, e.g., County's Opening Br. at 15-16 (indicating Luce's belief that the County's Wind Farm Resource Overlay Zone ordinance "'improperly usurps and unnecessarily duplicates EFSEC's statutory role in the siting of energy facilities and . . . must therefore be preempted'" (alteration in original) (quoting Ex. 1 to Dep. of Luce at 69)). This does not show any bias against the County.

¶95 Petitioners also claim that Luce violated the doctrine by engaging in ex parte communications with the governor, counsel for Horizon (Darrell Peeples), and a representative for party Renewable Northwest Project (RNP). The allegations relate to comments made by the governor at the dedication of a previously sited wind project in Kittitas County. Dep. of Luce at 17-20. Those comments were interpreted in a newspaper editorial as reflecting the governor's general policy about preemption in the siting process. Luce expressed concern to the governor's office that her remarks at the dedication needed clarification based on

the editorial. *Id.* at 20. Luce admitted that he sent a proposed draft letter to the governor. *Id.* at 115. Peeples and a representative of RNP asked Luce for a copy of any written clarification from the governor if she made it. *Id.* at 17-18. When the governor wrote a letter to Luce explaining her position on preemption, Luce distributed it at EFSEC's regular public meeting. He also sent a copy to Peeples and RNP as requested. *Id.* Luce denied that Peeples ever asked him to contact the governor or that Peeples requested that the governor clarify her position. *Id.* at 20.

¶96 This unremarkable exchange suggests no bias or prejudice. A simple request for a document that was made public does not indicate any impermissible ex parte communication. The communication did not relate to any proceeding regarding Horizon's application.

¶97 We hold that the participation by DNR and CTED, as statutorily mandated members of EFSEC, did not violate the appearance of fairness doctrine. Furthermore, we hold that Petitioners have presented no evidence in the administrative record and evidence produced in the superior court to show that Luce violated the appearance of fairness doctrine. Furthermore, Petitioners do not argue that further discovery or evidentiary hearings in the superior court would make an adequate showing of bias or prejudice.

F. *Substantial Evidence Supports EFSEC's Decision To Grant Horizon's Request for Preemption*

¶98 ROKT argues that EFSEC's decision to preempt the KCC is unsupportable under EFSLA and EFSEC's own regulations. This court may review the decision to determine if it is "supported by evidence that is substantial when viewed in light of the whole record before the court." RCW 34.05.570(3)(e). "[S]ubstantial evidence is 'a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order.' " *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 136 Wn.2d 38, 46, 959 P.2d 1091 (1998) (quoting *Callecod v. Wash. State Patrol*, 84 Wn. App. 663, 673, 929 P.2d 510 (1997)).

¶99 EFSLA requires EFSEC to determine if an application complies with a local government's land use laws. RCW 80.50.090. If not, EFSEC's rules (at the time of the KVWPP application) required the applicant to make all reasonable efforts to resolve the noncompliance. Former WAC 463-28--030(1). EFSEC would stay its own proceedings while the applicant sought compliance with the local government. Former WAC 463-28-030(2). The applicant had to submit regular reports to EFSEC regarding the status of negotiations with the local government. Former WAC 463-28--030(3). ROKT does not allege that Horizon did not meet these requirements.

¶100 If the applicant reported that efforts to resolve the noncompliance were not successful, then it could file a request for preemption. Former WAC 463-28-040. The request had to address the following issues:

(1) That the applicant has demonstrated a good faith effort to resolve the noncompliance issues.

(2) That the applicant and the local authorities are unable to reach an agreement which will resolve the issues.

(3) That alternate locations which are within the same county and city have been reviewed and have been found unacceptable.

(4) Interests of the state as delineated in RCW 80.50.010.

*Id.* In this case, Horizon requested preemption with EFSEC, addressing all four issues. After conducting a series of hearings, EFSEC entered an order recommending that the governor approve Horizon's application. The order included findings of fact and conclusions of law on Horizon's request for preemption.

¶101 ROKT contends that Horizon did not demonstrate good faith in its four-year negotiations with the County. Specifically, ROKT asserts that Horizon "had absolutely no interest in finding any level of compromise with Kittitas County." Br. of Pet'rs ROKT & Lathrop at 46.

¶102 In its order recommending approval, EFSEC recognized that its rule contained no definition of good faith. It

went on to determine that good faith includes a showing that (1) the applicant worked as extensively as possible to resolve inconsistencies, up to the point where further negotiations would be futile, and (2) reasonable compromises have been explored by both sides. In addition, it determined that good faith did not require resolution of all disputes. Applying this standard, EFSEC determined that Horizon demonstrated good faith.

¶103 We believe that EFSEC properly applied its standard in finding that Horizon acted in good faith in trying to resolve its noncompliance with the KCC. The KCC Wind Farm Resource Overlay Zone ordinance required Horizon to apply for site-specific exceptions to both the County zoning ordinance and comprehensive plan and to seek approval from two county boards. Horizon actively participated in numerous hearings over a five-month period in an attempt to comply with the ordinance requirements. Horizon submitted reports and presented expert testimony on the various impacts of the Project. Such extensive participation facially demonstrates good faith negotiation.

¶104 The record does not support ROKT's claim that Horizon had no interest in finding compromise with the County. The parties engaged in extensive negotiations with both County boards, through which Horizon made many substantial amendments to its original application in order to comply with the KCC. Indeed, even ROKT asserts that "[f]rom the time it first filed its Application, the Applicant had been constantly modifying the scope of the project, the location and number of turbines, and the terms and conditions to which it agrees to be bound." Br. of Pet'rs ROKT & Lathrop at 62. This does not indicate a failure to seek a compromise. Instead, it supports EFSEC's finding that Horizon made continuous attempts to accommodate the County's concerns. The "modifications" referred to by ROKT directly relate to Horizon's proposals to reduce the size of the Project in order to mitigate the noise and visual effects of the Project.

¶105 In the end, the only issue that remained in contention was the setback distance of the turbines from nonparticipating resident properties. *See id.* at 48 (referring to setbacks as "the central issue at the County level").[16] At a turbine height of over 400 feet, the BOCC and County residents expressed concern over the visual and noise impact the KVWPP would have on the affected properties.[17]

¶106 Horizon made several substantial concessions on this issue. As mentioned, Horizon offered a sizable reduction of the Project from 120 turbines to 45-60 turbines in order to accommodate the County's concerns. In addition, Horizon offered to increase its proposed setback distance from 1,000 feet to 1,320 feet from nonparticipating residents in order to alleviate the County's concerns over noise and visual effects of the turbines. The BOCC proposed various alternative distances from 2,000 feet to 3,000 feet based largely on each commissioner's personal observations at an existing wind project site. The record reflects that Horizon attempted to address each proposal that was made and followed up with responses in correspondence with the County and at later meetings with the BOCC.

¶107 Ultimately, Horizon testified that an increase in setbacks to a distance of 2,500 feet would force Horizon to reduce the Project in half. Horizon claimed that such a drastic reduction would make the Project economically unviable. The BOCC requested that Horizon offer some economic data to show at what size the Project would lose viability. Horizon responded by explaining that it could not

---

[16] As EFSEC's order recommending preemption states, "[a]lthough the BOCC does not explicitly state as much in Resolution 2006-90, it would appear to the Council that the BOCC concluded that the proposed Project complied with the County's Wind Farm [Resource] Overlay [Zone] Ordinance in nearly all respects, excepting concerns for height, visual impacts and shadow flicker effects." AR at 1472 (Council Order No. 826, at 16 n.33).

[17] Indeed, the very thought of such imposing structures across the landscape conjures up one of the most enduring literary scenes. " 'It is very evident,' answered Don Quixote, 'that thou art not versed in the business of adventures: they are giants: and, if thou art afraid, get thee aside and pray, whilst I engage with them in fierce and unequal combat.' " MIGUEL DE CERVANTES SAAVEDRA, DON QUIXOTE DE LA MANCHA 59 (Motteux, Jarvis, & Smollett rev. trans., New York: D. Appleton & Co. 1863) (1605).

reduce the Project within the BOCC's proposals because such a reduction would decrease Horizon's chances to sell the energy in a highly competitive utilities market. When Horizon did not provide the BOCC with its financial information, the BOCC denied the application.

¶108 ROKT argues that Horizon did not seek a compromise as to the setback distance because it refused to provide any economic data to support its assertion that further setbacks from 1,320 feet would render the Project economically unviable. However, EFSEC determined that it would not require Horizon to disclose such information because economic analysis was beyond its expertise. EFSLA requires EFSEC to develop environmental and ecological guidelines regarding energy facility siting. RCW 80.50-.040(2). As economic analysis does not relate to environmental or ecological concerns, we believe EFSEC was within its authority to refuse to review the economic viability of the KVWPP. Furthermore, we believe that Horizon presented a sufficient explanation that reducing the Project by over one-half of its original size would substantially decrease its chances to sell electricity.

¶109 ROKT also argues that EFSEC did not properly evaluate alternative locations under its third criterion for preemption. EFSEC determined that no alternative site would satisfy the requirements for the KVWPP. ROKT argues that EFSEC applied the wrong standard for review of this issue by focusing on alternatives available to Horizon, rather than focusing on the State's energy needs. Br. of Pet'rs ROKT & Lathrop at 65. However, the criteria under former WAC 463-28-040 referred to issues that the applicant must address. It would be unreasonable to require Horizon to address any alternatives that were not available to it in making a request for preemption.

¶110 Lastly, ROKT claims that EFSEC did not properly evaluate the fourth criterion relating to the State's interest in citing energy facilities. The record indicates that EFSEC adequately addressed the fourth criterion regarding the State's interests. We consider the evaluation of the

State's interest in providing abundant and affordable energy largely a matter of public interest, and we afford great deference to EFSEC's expertise in this field. *Hillis v. Dep't of Ecology*, 131 Wn.2d 373, 396, 932 P.2d 139 (1997); *Schuh v. Dep't of Ecology*, 100 Wn.2d 180, 187, 667 P.2d 64 (1983).

¶111 Based on our review of this record, including the numerous public hearings and correspondence between Horizon and the County, we hold that substantial evidence supports EFSEC's conclusion to recommend preemption based on the criteria under former WAC 463-28-040.

## CONCLUSION

¶112 We have appellate jurisdiction to review administrative decisions and we accept review of this case pursuant to the certification procedures established under RCW 80.50.140. Applying the review standards under the APA, we hold that EFSLA governs the siting of wind energy facilities and that EFSEC's preemption power does not violate the GMA. Furthermore, we hold that the FEIS produced in this case adequately considered the mitigation of visual impacts for the Project. We also hold that EFSEC members did not violate the appearance of fairness doctrine. And finally, we hold that substantial evidence supports EFSEC's decision to preempt the County's land use and zoning laws. For these reasons, we affirm the governor's final decision to approve the KVWPP site certification application.

C. JOHNSON, MADSEN, SANDERS, CHAMBERS, FAIRHURST, J.M. JOHNSON, and STEPHENS, JJ., and BROWN, J. PRO TEM., concur.